IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NORFOLK SOUTHERN RAILWAY COMPANY,  )
                                   )
            Plaintiff,             )
                                   )
            v.                     )    Civil Action No. 04-1808
                                   )
CITY OF PITTSBURGH,                )    Judge Conti
                                   )    Magistrate Judge Hay
            Defendant.             )
_____

CITY OF PITTSBURGH,                )
                                   )
            Third-Party Plaintiff, )
                                   )
            v.                     )
                                   )
CHARLES L. DESMONE & ASSOCIATES    )
tdba DESMONE & ASSOCIATES          )
ARCHITECTS,                        )
                                   )
            Third-Party Defendants. )
_____

CHARLES L. DESMONE & ASSOCIATES    )
tdba DESMONE & ASSOCIATES          )
ARCHITECTS,                        )
                                   )
            Fourth-Party Plaintiff, )
                                   )
            v.                     )
                                   )
MAZZA ENGINEERING ASSOCIATES,      )
Inc.,                              )
            Fourth-Party Defendant  )
_____

REPORT AND RECOMMENDATION

I.    RECOMMENDATION

       It is respectfully submitted that the Motion for

Temporary Restraining Order (dkt. no. 19) filed by plaintiff

Norfolk Southern Railway Corporation be dismissed as moot; that

the Motion for Partial Dismissal of Plaintiff's Complaint (dkt. no. 13) filed by defendant City of Pittsburgh be granted; and that the Motion for Preliminary Injunction (dkt. no. 26) filed by plaintiff Norfolk Southern Railway Corporation be granted and that within ten days the parties submit a brief statement concerning the appropriate amount of the bond to be posted by Norfolk Southern.

II.   REPORT

    **A.   Introduction**

       On November 24, 2004, the plaintiff, Norfolk Southern Railway Company ("Norfolk Southern"), filed a complaint against the defendant, the City of Pittsburgh (the "City"), seeking, *inter alia*, a preliminary injunction "to compel the City of Pittsburgh to abate and correct an unreasonably dangerous condition." Complaint, ¶ 1. Norfolk Southern alleged that "[o]n at least six occasions since May 7, 2004, landslides of "boulders, asphalt, trees and other debris" had fallen from the City's property onto Norfolk Southern's railroad tracks. Id. According to the complaint, one landslide caused a multi-car derailment and each landslide "resulted in extended stoppages and delays in train traffic and extensive monetary losses to clean up the debris." Complaint, ¶¶ 1 & 12. Thereafter, Norfolk Southern posted a flagman at the location of the landslides on a twenty-

four hour per day basis to guide its trains through the area.
Complaint ¶ 2.

Norfolk Southern also filed a Motion for Preliminary
Injunction with its complaint.  At a status conference on
December 6, 2004, the parties reached an agreement, which
included (1) the expedited completion of an engineer's report,
previously commissioned by the City to explore and develop repair
alternatives for long-term stability of slope failure at Corfu
Street, which sits atop the slope and above Norfolk Southern's
property, (2) the continued posting of a Norfolk Southern flagman
and (3) withdrawal of the motion for preliminary injunction,
without prejudice, pending receipt of the engineer's report.  See
Dkt. no. 9.

Shortly thereafter, the City filed a Motion for Partial
Dismissal of Plaintiff's Complaint, seeking to dismiss the public
nuisance claim.

On February 1, 2005, Norfolk Southern filed a motion
for a temporary restraining order, seeking the immediate removal
of a cluster of boulders located on the aforementioned slope on
the City's property.  Apparently this cluster had been identified
in the engineering report as a threat to rail traffic and
portions of the cluster had slid onto Norfolk Southern's tacks on
two occasions in early January, 2005.  The parties reached an
agreement, however, which would permit Norfolk Southern to enter

3

onto the City's property to remove the largest boulder in the cluster and to erect a catchment fence along one hundred feet of the City's property.  As Norfolk Southern was constructing the fence, the large boulder reportedly fell out of the cluster on its own without causing any damage.

On February 18, 2005, Norfolk Southern filed a renewed Motion for Preliminary Injunction following the then most recent incident, *i.e.*, a landslide on February 15, 2005.  This Court set a schedule for expedited discovery and conducted a preliminary injunction hearing on June 8-9, 2005.

**B.   Motion for Temporary Restraining Order**

Norfolk Southern concedes that the matter at issue in its request for a temporary restraining order has now been resolved.  See Motion for Preliminary Injunction (dkt. no. 26), n.1.  Thus, we recommend that the district court dismiss this motion as moot.

**C.   Motion for Partial Dismissal of Plaintiff's Complaint**

The City has moved to dismiss Count I of the complaint, which is a claim of public nuisance, on two grounds.  Pursuant to Fed.R.Civ.P. 12(b)(1), the City argues that the harm alleged is in the nature of a threat of future harm, which has not yet actually been suffered and, thus, Count I is speculative and not ripe for judicial review, depriving the Court of subject matter jurisdiction.  Pursuant to Fed.R.Civ.P. 12(b)(6), the City

4

asserts that Count I does not allege facts which constitute damage to Norfolk Southern different from that which would be suffered by members of the general public and the damages claimed are not the type of damages that can be incurred while exercising a right common to the public.  Accordingly, the City argues that Count I fails to state a claim upon which relief can be granted.

### Standard of Review

Where a defendant attacks the complaint on its face in challenging the Court's subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the court "must consider the allegations of the complaint as true."  Mortensen v. First Federal Sav. and Loan Ass'n., 549 F.2d 884, 891 (3d Cir. 1977).

A motion to dismiss made pursuant to Fed.R.Civ.P. 12(b)(6) may be granted by the court if it is satisfied "that no relief could be granted under any set of facts that could be proved consistent with the allegation."  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41 (1957).  The issue is not whether the plaintiff will prevail at the end but only whether it should be entitled to offer evidence to support its claim.  Neitzke v. Williams, 490 U.S. 319 (1989); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Davis v. Scheuer, 468 U.S. 183 (1984).  The complaint must be read in the light most favorable to the plaintiff and all

well-pleaded, material allegations in the complaint must be taken as true.  Estelle v. Gamble, 429 U.S. 97 (1976).

### Discussion

Pennsylvania has adopted section 821B of the Restatement (Second) of Torts which provides that "[a] public nuisance is an unreasonable interference with a right common to the general public."  RESTATEMENT (SECOND) OF TORTS § 821B(1)(1979); see Muehlieb v. City of Philadelphia, 574 A.2d 1208, 1211 (Pa. Commw. 1990); Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 315 (3d Cir. 1985), cert. denied, 474 U.S. 980 (1985).  The requirements of section 821C(2) of the Restatement (Second) of Torts apply in determining whether a plaintiff has standing to enjoin a public nuisance.  See Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc., 845 F.Supp. 295, 301 (E.D. Pa. 1994).  Section 821C(2) provides that in order to "maintain a proceeding to enjoin to abate a public nuisance one must have [inter alia] the right to recover damages as indicated in Subsection (1)."  RESTATEMENT (SECOND) OF TORTS §821C(2)(a) (1979).  Subsection (1) in turn provides as follows:

> In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of the interference.

RESTATEMENT (SECOND) OF TORTS § 821C(1)(1979); Hercules, 762 F.2d

at 315; <u>Graham Oil Company v. BP Oil Company</u>, 885 F.Supp. 716, 723 (W.D.Pa. 1994).

Norfolk Southern's Complaint identifies three public rights it asserts are implicated in this case, including the right to transport freight on Norfolk Southern's tracks, the right not to be exposed to hazardous materials and the right to travel safely on Angle and Corfu Streets.   Norfolk Southern cites to 49 U.S.C. § 11101(a) and <u>G.S. Roofing Prods., Inc. v. Surface Transp. Bd.</u>, 143 F.3d 387 (8th Cir. 1998), for the proposition that the statutory common carrier obligation imposes a duty upon railroads to "provide . . . transportation or service upon reasonable request."   Norfolk Southern seems to suggest that this duty somehow transcends into a general right of the public to transport goods and freight on Norfolk Southern's private tracks.   Assuming, *arguendo*, that such a public right exists, it is unclear how Norfolk Southern can be obligated to transport goods and simultaneously exercise a right to do so.   Norfolk Southern has cited no authority for this proposition and we have found none.   As the City suggests, the statute and the <u>G.S. Roofing Prods., Inc.</u> case make clear that a railroad has a duty to and on behalf of the public to transport goods rather than a right that is shared with the public to do so.

As well, the harm alleged by Norfolk Southern is simply not that generally recognized as harm suffered in the exercise of

a right common to the public: "For example, if 'A pollutes public waters, killing all the fish, [and] B, who has been operating a commercial fishery in these waters, suffers pecuniary loss as a result, [then] B can recover for public nuisance.'" Graham, 885 F.Supp. At 723, citing RESTATEMENT (SECOND) OF TORTS § 821C, comment (h), illus. 11 (1979).  Here Norfolk Southern alleges pecuniary losses such as the cost to clear and repair track, the cost of posting a flagman, and the like.  We agree with the City that this is not the type of harm typically suffered by the public since the harm constitutes costs associated with a railroad conducting its business -- the operation of which the general public has no right to manage -- on its private property -- to which the general public has no right of access.

Because it cannot be said from the facts alleged that Norfolk Southern was exercising a right common to the general public, Norfolk Southern has not met the requirements of section 821C(1)&(2).  Thus, Norfolk Southern lacks standing to pursue its action for public nuisance based on a public right to transport freight.  RESTATEMENT (SECOND) OF TORTS § 821C(1)(1979); Hercules, 762 F.2d at 315; Graham Oil Company v. BP Oil Company, 885 F.Supp. 716, 723 (W.D.Pa. 1994).

As concerns the right to travel safely on Angle and Corfu Streets, the City argues that Norfolk Southern lacks standing to assert such a claim since Norfolk Southern has not

8

alleged any harm of a kind different than that suffered by the
general public.  Norfolk Southern did not address this argument
in its response to the City's motion.  Further, we note that
Norfolk Southern has not alleged in its complaint any harm it
purportedly suffered while exercising a right to travel safely on
City streets.  Additionally, it is not altogether clear that as a
private railroad Norfolk Southern could exercise such a right.
Nevertheless, assuming that Norfolk Southern has the same right
as the public to safely travel City streets, and assuming that
Norfolk Southern suffered harm as a result of traveling on Angle
or Corfu Streets due to allegedly unsafe conditions thereon, such
harm would be identical to and, thus, not of a kind different
from that suffered by the general public.  Accordingly, because
Norfolk Southern cannot meet the requirements of section
821C(1)&(2), Norfolk Southern lacks standing to pursue its claim
for public nuisance based on a public right to travel safely on
Angle and Corfu Streets.

     With regard to Norfolk Southern's claim that the public
has a right not to be exposed to hazardous materials, which are
transported on Norfolk Southern's tracks, including the Mon Line,
and which pose a threat to the public safety should there be a
derailment involving cars carrying such materials, the City
concedes that a public nuisance claim could potentially exist
under these circumstances.  However, the City argues that because

Norfolk Southern's averments in this regard are in the nature of a threat of future harm, which has not yet actually been suffered, Norfolk Southern's claims are speculative and not ripe for judicial review.

Although it is clear that injunctive relief is intended to affect future conduct and guard against future injury, a federal court must nevertheless ensure that the requirements of Article III, including ripeness, are satisfied regardless of the type of relief sought.  See Philadelphia Federation of Teachers, American Federation of Teachers, AFL-CIO v. Ridge, 150 F.3d 319, 322-23.  Ripeness determines when a party may bring an action.  Id. at 323.  The ripeness doctrine prevents federal courts from "entangling themselves in abstract disagreements."  Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977).  Where the action is based on a contingency, it is unlikely to be ripe for review.  Armstrong World Industries, Inc. by Wolfson v. Adams, 961 F.2d 405, 412 (3d Cir. 1992).

Nevertheless, a party "does not have to await the consummation of threatened injury to obtain preventative relief."  Pacific Gas & Elec. Co. v. State Energy Resource Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983)(cited in Armstrong World Indus. v. Adams, 961 F.2d at 412)).  Rather, for purposes of ripeness, the plaintiff need only allege facts showing that the

probability of the future event occurring is real and substantial.  Armstrong, 961 F.2d at 412.

Here, it appears from the facts alleged that the probability of another landslide is real and substantial. According to the Complaint, there have been six landslides since May 7, 2004, approximating one per month, and every significant rainstorm has produced another landslide.  Complaint ¶¶ 12, 15, 16.  The probability is not as real and substantial, however, that any future landslide will cause (1) a derailment and (2) the derailment of a train car carrying hazardous materials that will imperil the City's residents.  While the consequences of the latter are indeed frightening, the law requires that Norfolk Southern must be put to the test of establishing that its claim is ripe for review.  Accepting as true all averments in the complaint, Norfolk Southern has nevertheless not met the test.

For the above stated reasons, the district court should grant the City's motion for dismissal of the public nuisance claim.

**D.   Motion for Preliminary Injunction**

***Findings of Fact***

1.   Norfolk Southern owns and operates rail lines and associated railroad facilities.  In particular, Norfolk Southern owns and operates four major rail lines that run through the City of Pittsburgh, including one that is known as the Mon Line.  The

Mon Line is eighty-five and one-half miles long and runs along the Ohio and Monongahela Rivers.  The Mon Line is one of Norfolk Southern's core routes, carrying freight from Cruxton, New York on the East Coast, to Chicago, Kansas City, and to Norfolk Southern's western gateways.  Because the Mon Line has a higher clearance than Norfolk Southern's other three lines in the area whose cars are restricted to a height of seventeen feet ten inches, taller train cars hauling automobile carriers and doubled stacked containers, for example, are run on the Mon Line. Approximately sixty to sixty-five trains per day travel the Mon Line.  Complaint, ¶ 4; Tr. 6-7, 35, 77-78, 85-86.[1]

    2.   A series of landslides have occurred at or near Mile Post 4.3 on the Mon Line ("Mile Post ML-4.3") since January of 2004.  These landslides of boulders, asphalt, trees, and other debris have originated from adjacent property, which is owned by the City.  Tr. 130-34.

    3.   The landslides experienced by Norfolk Southern at Mile Post ML-4.3 are as follows:

| | |
|---|---|
| January 8, 2004 | 30 tons of rock blocking Main 2 track |
| January 9, 2004 | 20 tons of rock and debris fouling the roadway |

---

1.   "Tr." refers to the transcript of the preliminary injunction hearing held on June 8-9, 2005.

| | |
|---|---|
| May 6, 2004[2] | 175 tons of rock and debris fell blocking Main 2 track and derailing five cars in a southbound train |
| August 22, 2004 | 65 tons of rock and debris fell blocking the roadway |
| September 17, 2004 | 220 plus tons of rock, debris and mud fell blocking both Main 1 and Main 2 tracks |
| November 16, 2004 | 65 tons of rock and debris fell fouling Main 2 track |
| January 5, 2005 | 800 plus tons of rock and mud fell blocking both Main 1 and Main 2 tracks |
| January 6, 2005 | 70 tons of rock fell fouling Main 2 track |
| January 7, 2005 | 200 tons of mud and rock fell blocking Main 2 track |
| January 21, 2005 | 40 plus tons fell fouling Main 2 track |
| February 17, 2005 | Several large rocks (4'x5'x7') fell fouling Main 1 track |
| February 24, 2005 | A large rock fell, injuring a Norfolk Southern employee.  Several large rocks (4'3'5') had fallen fouling Main 1 track . |

Tr. 22-32; Pltf's P. I. Hrg. Ex. 2.

     4.   Norfolk Southern advised the City of the dangerous condition on its property on several occasions, beginning with the derailment incident on May 6, 2004.  Complaint, ¶¶ 14, 20.

---

2.   According to the testimony of Norfolk Southern employees and Exhibit 2 admitted into evidence at the preliminary injunction hearing, the date of this incident appears to be May 6 and not May 7 as set forth in the Complaint.

5.   After each landslide, Norfolk Southern mobilized equipment and personnel to clear the tracks and/or roadbed.  Tr. 23, 29, 31-32.

6.   After the May 6, 2004 landslide and derailment, Norfolk Southern posted a flagman/watchman approximately one hundred to one hundred and fifty yards away from the landslide area, to monitor the hillside and stop train traffic in the event of another landslide.  A flagman/watchman is in position twenty-four hours a day, seven days a week.  Tr. 26.

7.   The flagman/watchman provides a limited improvement in safety because if a landslide occurs after the "clear" signal has been given, a derailment could result.  Tr. 27.

8.   On February 24, 2005, Norfolk Southern workers were removing several large rocks that had fallen onto the center of Main 1 track when one of the workers was struck in the head by a rock that careened off the hillside.  He suffered contusions and required stitches.  Tr. 31-32.

9.   A landslide threatens the lives and safety of Norfolk Southern's crews operating the trains and its workmen working in the Mile Post ML-4.3 area.  Tr. 78-82.

10.   The City-owned hillside adjacent to Norfolk Southern's property at Mile Post ML-4.3 supports certain city streets, including Corfu Street.  Corfu Street lies approximately

14

one hundred and forty feet above Norfolk Southern's tracks.
Corfu Street is situated on a bench about midway up the face of a
steep hillside.  The City's West End Overlook lies at the
uppermost portion of the hillside.  See D'Appolonia report dated
December, 2004 (Ex. A to the Motion for Preliminary Injunction).

    11.  A portion of the hillside under Corfu Street
involves a partially eroded prehistoric or ancient landslide
mass, which had been dormant until sometime in the past ten years
when it became re-activated.  Evidence of the re-activation can
be seen in the landslide of May 6, 2004, *i.e.*, pieces of this
ancient land mass broke off and slid down to the railroad tracks.
Tr. 127; 156-58.

    12.  The hillside under Corfu Street has become
unstable as a result of the re-activation.  Independent of this
lawsuit, the City engaged D'Appolonia, Engineering Division of
Ground Technology, Inc. ("D'Appolonia") to conduct a sub-surface
exploration and develop conceptual repair alternatives for the
long-term stabilization of the slope failure at Corfu Street
and/or for the protection of facilities above and below the
slope, including the protection of Norfolk Southern's property.
Tr. 198.

    13.  D'Appolonia prepared a report for the City which
posed two alternative plans: (1) to excavate the slope to a more
stable configuration and relocate the roadway, *i.e.*, Corfu

Street, to the rear of the topographic bench, together with the installation of short lengths of retaining walls to support the remnant front yards of the two houses remaining on Corfu Street; and (2) to construct an anchored retaining wall along the north edge of Corfu Street to maintain the roadway in its current location.  See D'Appolonia report dated December, 2004 (Ex. A to the Motion for Preliminary Injunction); Tr. 203-205.

14.  To date, the City has taken no action on the D'Appolonia report.  Complaint, ¶ 20.

15.  According to Norfolk Southern's expert, Dr. James Hamel, an expert in geotechnical and geological issues, and D'Appolonia's Senior Project Engineer, Joseph W. Premozic, P.E., if an engineering solution is not implemented, the landslide problem under Corfu Street will continue, with a potentially catastrophic slope failure, resulting in the entirety of Corfu Street and its remaining houses falling onto Norfolk Southern's tracks.  Tr. 150, 193, 200.

16.  Norfolk Southern has brought suit against the City on, *inter alia*, a claim of negligence.  Specifically, Norfolk Southern alleges that the City has breached its duty to Norfolk Southern as an adjoining landowner, to abate a dangerous condition on the City's property.  Complaint, ¶¶ 1, 35, 36-40.

17.  A dangerous and potentially deadly condition exists on the City's property of which the City has had actual notice since at least May 6, 2004.  Complaint, ¶¶ 14, 20.

### Conclusions of Law

1.  Although Norfolk Southern's request for injunctive relief is based on state law causes of action (negligence, public nuisance, private nuisance), this Court must utilize a federal standard in evaluating whether preliminary injunctive relief is appropriate.  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989).

2.  The grant of injunctive relief "is an 'extraordinary remedy, which should be granted only in limited circumstances.'"  Instant Air Freight, 882 F.2d at 800 (quoting Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988)).

3.  To obtain a preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured pendente lite if relief is not granted . . ..  Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994)
(citations omitted).

   4. A preliminary injunction cannot be granted absent
a showing of irreparable harm.  Instant Air Freight Co., 882 F.2d
at 800.  The moving party must offer a "clear showing of
immediate irreparable injury."  ECRI v. McGraw-Hill, Inc., 809
F.2d 223, 226 (3d Cir. 1987) (district court's preliminary
injunction vacated due to plaintiff's failure to show irreparable
harm).

   5. In order to prove irreparable harm, the moving
party "must 'demonstrate potential harm which cannot be redressed
by a legal or an equitable remedy following trial.'"  Acierno, 40
F.3d at 653 (quoting Instant Air Freight Co., 882 F.2d at 801).
"The preliminary injunction must be the only way of protecting
the plaintiff from harm."  Instant Air Freight Co., 882 F.2d at
901.

   6. Mere economic loss "does not constitute
irreparable harm."  Acierno, 40 F.3d at 653.

   7. "[T]he injury created by a failure to issue the
requested injunction must "be of a peculiar nature, so that
compensation in money cannot atone for it."  Acierno, 40 F.3d at
653 (citations omitted).  The word "irreparable connotes that
which cannot be repaired, retrieved, put down again, atoned for."
Id. (citations omitted).

8.   Mandatory injunctions should be used sparingly. U.S. v. Price, 688 F.2d 204, 212 (3d Cir. 1982)(citation omitted).

9.   "A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." Id. (citation omitted).

10.  Nevertheless, where a party requests a mandatory injunction, the test is one of balancing the competing interests. Id.

11.  The claimed injury cannot merely be possible, speculative or remote.  "Establishing a risk of irreparable harm is not enough."  ECRI, 809 F.2d at 226.

12.  "The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury.'"  Acierno, 40 F.3d at 655 (citations omitted).

13.  Norfolk Southern has established a reasonable probability of eventual success in the litigation on its negligence and private nuisance claims and that it will be irreparably harmed pendente lite if an injunction does not issue.

14.  In Pennsylvania, upper landowners have a duty to use and maintain their property so as not to injure lower or

adjoining landowners.  McArthur v. Balas, 166 A.2d 640 (Pa. 1961); McCarthy v. Ference, 58 A.2d 49 (Pa. 1948).

15.  Possessors of land are subject to liability for harm to adjoining landowners caused by a dangerous condition on the property if the possessors knew of the dangerous condition or could have learned about it through the exercise of reasonable care.  Barker v. Brown, 340 A.2d 566, 569 (Pa.Super. 1975) (landowner has duty to guard against unreasonably dangerous natural conditions on its property).

16.  The landowner's liability for harm caused by a dangerous condition on his property need not be predicated on the landowner having created the dangerous condition.  McArthur v. Balas, 166 A.2d at 122.

17.  Applying Pennsylvania law to the facts of this case, the City's failure to undertake a solution to abate the landslides constitutes negligence.

18.  The City's argument that Norfolk Southern cannot succeed on the merits because the City may avoid liability due to an "act of God" or "force of nature" is not supported by any evidence in the record.  "An act of God, as defined in the law, is an unusual, extraordinary, sudden, and unexpected manifestation of the forces of nature which cannot be prevented by human care, skill or foresight."  Carlson v. A. & P. Corrugated Box Corp., 72 A.2d 290, 291 (1950)(citations omitted).

In order to base the re-activation of the ancient landslide mass on the significant amount of rainfall that occurred during the time frame at issue, one would need to demonstrate that the amount of precipitation or interval of precipitation was greater than previously experienced over a substantial period of time. However, the undisputed expert testimony is that such is not the case here.  Indeed, over the past one hundred and sixty years, on average, about one out of every six years, Pittsburgh experiences as much rainfall in a four-month period as it did during the applicable periods in 2004 at issue in this case.  Tr. 154.

19.  Pennsylvania follows the Restatement (Second) of Torts' formulation of private nuisance.  <u>Golen v. Union Corporation, U.C.O.-M.B.A.</u>, 718 A.2d 298, 300 (Pa. Super 1998). Section 821D defines private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land."  RESTATEMENT (SECOND) OF TORTS, § 821D.

20.  Pennsylvania has adopted the general rule of liability for private nuisance found in section 822 of the Restatement (Second) of Torts, which provides as follows:

> One is subject to liability for a private
> nuisance if, but only if, his conduct is a
> legal cause of an invasion of another's
> interest in the private use and enjoyment of
> land, and the invasion is either
> > (a) intentional and unreasonable, or
> > (b) unintentional and otherwise actionable under
> > the rules controlling liability for negligent or
> > reckless conduct, or for abnormally dangerous
> > conditions or activities.

21

See Kembel v. Schlegel, 478 A.2d 11, 14-15 (Pa. Super. 1984).

      21.  An injury that is foreseeable and preventable is "intentional," and an intentional injury caused by the maintenance of a private nuisance is actionable.  Maier v. Publicker Commercial Alcohol Co., 62 F.Supp. 161, 165 (E.D. Pa. 1945), aff'd, 154 F.2d 1020 (3d Cir. 1946).

      22.  As the comments discuss, whereas a trespass is an invasion of the interest in the exclusive possession of land, a nuisance is an interference with the interest in the private use and enjoyment of the land and does not require interference with possession, hence it involves a "nontrespassory" invasion. RESTATEMENT (SECOND) OF TORTS, § 821D, comment d.

      23.  As the comments also note, there may be some overlapping of the causes of action for trespass and private nuisance; for example, the flooding of the plaintiff's land, which is a trespass, is also a nuisance if it is repeated or of a long duration.  Id. at comment e.

      24.  Norfolk Southern advised the City of the dangerous condition on its property on several occasions, beginning with the derailment incident on May 6, 2004.  As well, the City had undertaken an engineering study independent of this litigation, indicating an awareness of the dangerous condition.  Future injury to Norfolk Southern was foreseeable and preventable and,

thus intentional.  Complaint, ¶¶ 14. 20; Tr. 198;  <u>Maier</u>, 62
F.Supp. at 165.

> 25.  The City's failure to take action to abate the
private nuisance caused the dangerous condition to persist and
worsen.  Tr. 150, 193, 200.

> 26.  There is a "presently existing actual threat" of
personal – and possibly deadly – injury to Norfolk Southern
employees from a landslide from the City's property at Mile Post
ML-4.3.  As such, Norfolk Southern has established immediate
irreparable harm.  <u>Acierno</u>, 40 F.3d at 655.

> 27.  The City argues that greater harm will result to
the City if an injunction issues.  Although the City refers to
its distressed financial status, the City does not specify
precisely how it will suffer greater harm and we perceive none.
"Although courts are rarely called upon to issue mandatory
injunctions calling for the payment of moneys pendente lite, they
have done so when the equities and the circumstances of the case
demonstrated the appropriateness of the remedy."  <u>U.S. v. Price</u>,
688 F.2d at 213 (citations omitted).  The balance of hardships
tips in favor of granting the preliminary injunction since there
is a presently existing threat of continuing landslides that will
irreparably harm Norfolk Southern.

> 28.  A preliminary injunction will serve the public
interest because it will correct a dangerous condition that

imperils the lives and safety of Norfolk Southern train crews as well as members of the public who work and reside in the area.

29.   Forcing the City to implement an engineering solution to correct a dangerous condition on its property is the only way to protect Norfolk Southern from harm from the landslides.  As discussed, the flagman provides limited protection because a landslide could occur and cause a derailment or other injury after he gives the "clear" signal.  The experts for both sides agree that without undertaking an engineering solution, the landslide problem will certainly continue, with potentially catastrophic consequences.  The City's suggestion that Norfolk Southern should take action, such as ceasing operations on its own property or undertaking the corrective measures itself, as it did with regard to the boulder cluster problem, to avoid the harm being caused by a dangerous condition on the City's property so that the City is not required to expend monies is, as Norfolk Southern has suggested, perverse.

30.   Norfolk Southern has satisfied all four requirements to obtain injunctive relief.  <u>Acierno</u>, 40 F.3d at 653.[3]  Therefore, the court should grant the motion for preliminary injunction and order the parties to file a brief statement concerning the appropriate amount of the bond to be posted by Norfolk Southern.

Respectfully submitted,

<u>s/ Amy Reynolds Hay</u>
AMY REYNOLDS HAY
United States Magistrate Judge

Dated: July 26, 2005

cc:  W. Gregory Rhodes, Esquire
     Klett, Rooney, Lieber & Schorling
     One Oxford Centre
     40th Floor
     Pittsburgh, PA 15219

     Jacqueline R. Morrow, City Solicitor
     John G. Shorall, II, Associate City Solicitor
     Matthew F. Dolfi, Assistant City Solicitor
     City of Pittsburgh Department of Law
     313 City-County Building
     414 Grant Building
     Pittsburgh, PA 15219

---

3.   We note here that we have not addressed a number of arguments the City raised in its opposition briefs since those arguments are not supported by the evidence presented at the preliminary injunction hearing, which occurred after briefs were filed.

Samuel H. Simon, Esquire
Houston Harbaugh, P.C.
Three Gateway Center, 22nd Floor
401 Liberty Avenue
Pittsburgh, PA 15222

Arthur J. Murphy, Jr., Esquire
Donald G. Lucidi, Esquire
Murphy Taylor, L.L.C.
326 Third Avenue
Pittsburgh, PA 15222